UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MEGAN S. BYFIELD,

Plaintiff,

-v.-

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

22 Civ. 5869 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Megan Byfield, proceeding *pro se*, brings this suit against Defendant New York City Department of Education (the "DOE"), alleging a litany of workplace violations.  In brief, Plaintiff claims that the DOE conspired against her after she began lodging complaints with it and other agencies following a workplace mold exposure incident in 2019.  Among other misdeeds, Plaintiff's operative complaint alleges that the DOE denied her medical leave, failed to accommodate her disability, retaliated against her, and, ultimately, terminated her employment.

Defendant DOE moves to dismiss Plaintiff's claims pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6).  For the reasons set forth in the remainder of this Opinion, the Court grants in part and denies in part Defendant's motion to dismiss.

## BACKGROUND[1]

### A.     Factual Background

Plaintiff was formerly employed by the DOE as a project manager.  (TAC ¶ 8).  Plaintiff began working there in 2007 and, in April 2011, joined the Division of Specialized Instruction & Student Support (the "Division"), where she processed tuition reimbursements for non-public schools.  (*Id.* ¶¶ 8, 11).

According to Plaintiff, on or about July 2, 2019, she was exposed to mold at her workplace when the bathrooms on the fourth floor of her office building were undergoing construction.  (TAC ¶¶ 15-17).  The next day, Plaintiff began experiencing "chills and a runny nose"; over the following two weeks, Plaintiff went to the emergency room several times for shortness of breath, coughing, and wheezing.  (*Id.* ¶¶ 18, 19).  There, Plaintiff was administered nebulization and was prescribed inhalers and steroids.  (*Id.* ¶ 19).  As a result of her illness, Plaintiff stopped going to work.  (*Id.* ¶ 21).

Following the incident, Plaintiff made several complaints to the City of New York, her supervisor, and her union, alleging that her illness was a result of her exposure to mold at work.  Plaintiff reported the incident to the New York City "311" complaint hotline on July 10, 2019, and July 22, 2019.  (TAC ¶ 20).  On July 13, 2019, Plaintiff notified her supervisor that the exposure was the

---

[1]     This Opinion draws its facts from the Third Amended Complaint (the "TAC" (Dkt. #49)), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on certain exhibits attached to the Declaration of Talysia Francis ("Francis Decl." (Dkt. #53)), which exhibits recount administrative records and correspondence between the parties that are specifically referenced in the TAC.  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

cause of her sickness and subsequent leave of absence. (*Id.* ¶ 21). Plaintiff shared with her supervisor letters that she had received from her doctors. (*Id.*). Ten days later, Plaintiff also notified District Council 37 ("DC-37"), her union, about her work-related illness. (*Id.* ¶ 22). The union advised Plaintiff to file a claim with the New York Workers' Compensation Board (the "WCB"). (*Id.*).

Plaintiff filed a worker's compensation claim the same day she received that advice. (TAC ¶ 23). Two weeks after Plaintiff filed her claim, she received a psychiatric evaluation. (*Id.* ¶ 24). As a result of the evaluation, Plaintiff was placed on a psychotherapy treatment plan, pursuant to which she attended weekly therapy sessions and was prescribed medications for anxiety and depression. (*Id.*). Plaintiff subsequently emailed a copy of her psychotherapy evaluation to the WCB as proof of her eligibility for lost wages. (*Id.* ¶ 27).

In addition to her worker's compensation claim, Plaintiff filed several requests with the DOE for a medical leave of absence, each of which was ultimately denied. On August 8, 2019, Plaintiff requested her first medical leave of absence through the DOE's self-service online application system. (TAC ¶ 26). On October 30, 2019, the DOE rejected Plaintiff's request for medical leave. (*Id.* ¶ 41). On November 5, 2019, Plaintiff re-submitted her application, with additional medical documentation to support her request, but this application was subsequently "auto-denied" by the DOE on November 9, 2019. (*Id.* ¶¶ 42, 43).

On September 2, 2019 — approximately two months after Plaintiff had stopped coming into work — the DOE ceased processing Plaintiff's leave of

absence in its attendance system, which triggered a series of payroll deductions. (TAC ¶ 29). This occurred, Plaintiff alleges, despite her accrual of sufficient "annual and sick time." (*Id.* ¶ 31). In late November 2019, the DOE disabled Plaintiff's remote access to her employee systems, including her work email. (*Id.* ¶ 54).

On November 18, 2019, the WCB held a pre-conference hearing to assess Plaintiff's worker's compensation claim. (TAC ¶ 44). The WCB judge reviewed Plaintiff's medical records and asked Plaintiff if she had been seen by a specialist. (*Id.*). A few days later, the Plaintiff was evaluated by a pulmonologist at Mount Sinai Hospital and was diagnosed with chronic fatigue and shortness of breath. (*Id.* ¶ 45). Plaintiff was also later evaluated by an allergy specialist, who confirmed that Plaintiff had been exposed to "Penicillium mold." (*Id.* ¶ 46). On December 27, 2019, Plaintiff shared these updates with the WCB. (*Id.* ¶ 47).

Between June and August 2020 — approximately one year after Plaintiff began absenting herself from work — the DOE repeatedly emailed Plaintiff at her work email address to inform her that her absence from work was "unauthorized." (TAC ¶¶ 57-62, 69). On or about September 17, 2020, an attorney for the DOE emailed Plaintiff at her personal email address to inform Plaintiff that she was on unauthorized leave, citing the agency's October 30, 2019 and November 9, 2019 rejections of Plaintiff's medical leave requests. (*Id.* ¶¶ 72, 74). The email also notified Plaintiff that, "[a]t this juncture," the DOE would reach out to Employee Relations and the Office of Labor Relations to

"discuss next steps."  (*Id.* ¶ 75).  In part because she did not have remote access to her work email, Plaintiff maintains that she was unaware that she was on unauthorized leave until she attended a hearing before the WCB on December 9, 2020.  (*Id.* ¶ 82).

During the December 9, 2020 hearing, the WCB found that there was insufficient medical documentation to establish a causal relationship between Plaintiff's employment and her illness.  (Francis Decl., Ex. B at 3).  As a result, on December 15, 2020, the WCB disallowed her claim.  (*Id.*).  Plaintiff subsequently appealed the decision and, on March 10, 2021, the WCB Appeal Board Panel affirmed the WCB's decision and closed Plaintiff's case.  (TAC ¶ 88; Francis Decl., Ex. C).

In March 2020, in response to the COVID-19 pandemic, the DOE told its employees to work remotely, after which Plaintiff returned to work.  (TAC ¶ 64).  Plaintiff alleges, however, that the DOE "willfully delayed [her] opportunity to work from home" until December 23, 2020, because "the technology department needed time to reconfigure and restore" her access to DOE systems.  (*Id.* ¶ 86).

As Plaintiff recounts, the DOE retaliated against her following her return to work through a series of adverse employment actions, including reducing Plaintiff's March 19, 2021 paycheck; retroactively terminating her health coverage to August 31, 2020; deleting her user account access to IT systems on April 1, 2021, and April 2, 2021; deactivating her direct deposit on April 1, 2021; and denying her union-negotiated pay increase of $10,387.13, with

Plaintiff being the only union member not to receive the raise.  (TAC ¶¶ 90-94, 104).

In the spring of 2021, with the COVID-19 pandemic on the wane, the DOE directed City employees to start returning to work in-person.  (Francis Decl., Ex. I at 2).  To that end, the DOE issued a return-to-office plan, pursuant to which employees were required to come into the office one day per week in June 2021, two days per week in July and August 2021, and full-time as of September 9, 2021.  (*Id.*).  In response to the plan's issuance, on April 22, 2021, Plaintiff emailed her supervisor requesting that she be allowed to continue to work remotely.  (*Id.* ¶ 105).  In the TAC, Plaintiff pleads that "adverse employment actions launched against [her] ... caused her severe stress," and that she was "not mentally equipped to return to a hostile work environment."  (*Id.* ¶ 107).  In one email to the DOE on June 15, 2021, Plaintiff stated that her "mental and physical health depend[ed] on [her] continued need to work from home."  (Francis Decl., Ex. D).

Plaintiff further alleges that her supervisor failed to follow proper escalation procedures in handling her request, delivering Plaintiff's request to an agency attorney to "weaponize" it, rather than forwarding the request to the DOE's Office of Disability Accommodations ("ODA").  (TAC ¶¶ 105-106).  On May 5, 2021, Plaintiff filed the accommodation request herself with the ODA, requesting that she be allowed to work remotely for another year (i.e., from May 5, 2021, to May 5, 2022).  (*Id.* ¶ 107).  The DOE subsequently denied

6

Plaintiff's accommodation request.  (*Id.* ¶ 108).  Despite the denial, Plaintiff continued to work from home.

According to Plaintiff, on May 28, 2021, the DOE launched a series of payroll deductions of $289.15 every pay period from Plaintiff's paycheck, ostensibly to pressure her to quit.  (TAC ¶ 110).  On June 18, 2021, the DOE emailed Plaintiff regarding a disciplinary conference scheduled for June 25, 2021, at which Plaintiff would be provided with the "opportunity to respond to an allegation regarding [her] failure to discharge [her] professional responsibilities," specifically, her alleged failure to comply with DOE's directives "regarding returning to the office."  (*Id.* ¶ 118; Francis Decl., Ex. E).  On August 17, 2021, the DOE sent Plaintiff a similar email, indicating that another disciplinary conference had been scheduled for August 25, 2021.  (TAC ¶ 124; Francis Decl., Ex. F).  Subsequently, on September 20, 2021, the DOE once again disabled Plaintiff's remote work access, effectively terminating Plaintiff's ability to work.  (TAC ¶ 126).

As a result of the DOE's denial of her repeated requests to work remotely, Plaintiff filed a "Failure to Accommodate" complaint with the New York State Division of Human Rights (the "SDHR") on May 27, 2021, and again on June 15, 2021.  (TAC ¶ 109).  Plaintiff then filed a third complaint with the SDHR on September 21, 2021, in order to challenge her effective termination when her remote access was disabled by the DOE.  (*Id.* ¶ 127).  Approximately one year later, the SDHR notified Plaintiff that "following an opportunity for review of related information and evidence ... the Division has determined that

there is no probable cause to believe that the [DOE] engaged in or is engaging in the unlawful discriminatory practice complained of." (Francis Decl., Ex. G).

On September 21, 2022, Plaintiff was summoned to a disciplinary conference before the Office of Administrative Trials and Hearings ("OATH"). (TAC ¶ 136). After what Plaintiff claims were insufficient efforts by the DOE to provide Plaintiff notice of her OATH hearing, a hearing before Administrative Law Judge ("ALJ") Joan Salzman was ultimately held on December 9, 2022. (*Id.* ¶ 137; Francis Decl., Ex. I at 2 n.1). Plaintiff did not appear. After reviewing the record, ALJ Salzman recommended that Plaintiff be "terminated from employment" because the DOE's documentary proof and sworn affidavits by Plaintiff's supervisor established that Plaintiff had "been absent without authorization" since October 2021. (Francis Decl., Ex. I at 2-3). On January 3, 2023, DOE Chancellor David Banks reviewed and affirmed ALJ Salzman's recommendation and formally terminated Plaintiff's employment. (TAC ¶ 139; Francis Decl., Ex. J).

## B. Procedural Background

Plaintiff initiated the instant lawsuit by filing a complaint on July 8, 2022. (Dkt. #2). The action originally named DC-37, DC-37's General Counsels, SDHR, SDHR's Regional Director, and the DOE as Defendants. (*Id.*). However, the Court dismissed the claims against all parties except the DOE *sua sponte* in an Order dated August 5, 2022. (Dkt. #11). On September 16, 2022, Plaintiff filed an amended complaint naming only the DOE. (Dkt. #18). On November 14, 2022, Defendant filed a letter motion seeking leave to file a

motion to dismiss the first amended complaint.  (Dkt. #19).  During a pre-motion conference on December 21, 2022, the Court indicated that it would allow Plaintiff to file a second amended complaint.  (Dkt. #34).

On January 30, 2023, Plaintiff filed her Second Amended Complaint (the "SAC" (Dkt. #31)).  However, because Plaintiff's thirty-four exhibits were improperly attached, Plaintiff re-filed the SAC on February 17, 2023.  (Dkt. #39).  Once again, Defendant requested leave to file a motion to dismiss Plaintiff's claims on March 17, 2023.  (Dkt. #43).  By Order dated May 12, 2023, the Court directed that Plaintiff file a third amended complaint.  (Dkt. #48).  The Court advised Plaintiff in that order that the third amended complaint would be her "final opportunity" to submit an amended pleading pursuant to Federal Rule of Civil Procedure 15, and that she should "be sure to include every allegation and claim she wishes to pursue."  (Dkt. #48).  On May 31, 2023, Plaintiff filed the TAC, which is the operative pleading in this case.  (Dkt. #49).

On June 14, 2023, Defendant filed a letter motion seeking leave to file a motion to dismiss the TAC.  (Dkt. #50).  The same day, the Court granted Defendant's application and set a briefing schedule for the motion to dismiss.  (Dkt. #51).  Defendant filed its opening submission on July 31, 2023.  ("Def. Br." (Dkt. #52)).  On September 4, 2023, Plaintiff filed a fifty-page opposition to Defendant's motion to dismiss.  ("Pl. Opp." (Dkt. #56)).  Defendant filed its reply papers on October 6, 2023.  ("Def. Reply" (Dkt. #59)).

## DISCUSSION

### A.    Applicable Law

Under Rule 12(b)(6), a defendant may seek dismissal of a plaintiff's action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  When considering a motion to dismiss under Rule 12(b)(6), a court must "draw all reasonable inferences in Plaintiff['s] favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief.'" *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  A plaintiff is entitled to relief if the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)).  Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

A court adjudicating a motion to dismiss under Rule 12(b)(6) "may review only a narrow universe of materials." *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).  This narrow universe includes "facts stated on the face of the

complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken," as well as documents that can properly be considered "integral" to the complaint. *Id.* (internal alterations omitted); *see generally United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021), *cert. denied*, — U.S. —, 142 S. Ct. 2679 (2022).

"[C]ourts must construe *pro se* pleadings broadly, and interpret them 'to raise the strongest arguments that they suggest.'" *Cruz* v. *Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (quoting *Graham* v. *Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)); *cf.* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). "However inartfully pleaded, a *pro se* complaint may not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief." *Legeno* v. *Corcoran Grp.*, 308 F. App'x 495, 496 (2d Cir. 2009) (summary order) (internal quotation marks and alterations omitted) (quoting *Posr* v. *Ct. Officer Shield No. 207*, 180 F.3d 409, 413 (2d Cir. 1999)). With that said, to survive a Rule 12(b)(6) motion to dismiss, a *pro se* plaintiff's factual allegations must at least "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Even in the *pro se* context, a court is not bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (quoting *Smith* v. *Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)); *see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

11

**B.     Analysis**

Plaintiff's TAC contains two sets of allegations.  *First*, Plaintiff alleges that the DOE violated the Americans with Disabilities Act of 1990 ("ADA"), the Rehabilitation Act of 1973, and, possibly, the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), when it failed to accommodate her requests to work remotely after DOE employees were instructed to return to the office in 2021.  *Second*, while not pleaded as explicitly, Plaintiff also alleges that the DOE retaliated against her in response to her filing a worker's compensation claim, requesting medical leave, and requesting an accommodation to continue working remotely.  By its motion, Defendant argues that Plaintiff's claims should be dismissed for failure to state a claim. The Court assess each category of Plaintiff's claims in turn.

**1.     The Court Grants Defendant's Motion to Dismiss Plaintiff's Failure to Accommodate Claims Under the ADA and the Rehabilitation Act**

To begin, Plaintiff alleges that Defendant failed to provide her reasonable accommodations in violation of the ADA and the Rehabilitation Act when it denied her request to work remotely after DOE employees were instructed to return to work in-person.  (TAC ¶ 140).[2]  In this regard, Plaintiff claims that her mental and physical health (presumably referring to her diagnoses of

---

[2]     The Second Circuit has recognized that although "there are 'subtle differences' between the ADA and the Rehabilitation Act, [courts] generally 'treat claims under the two statutes identically,' applying the same standards to both."  *Killoran* v. *Westhampton Beach Sch. Dist.*, No. 22-204, 2023 WL 4503278, at *2 (2d Cir. July 13, 2023) (summary order) (quoting *Henrietta D.* v. *Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (citation and internal quotation marks omitted)).

depression, chronic fatigue, anxiety, and shortness of breath) prevented her from returning to her office position.  Specifically, Plaintiff pleads that she "was not mentally equipped to return to a hostile work environment."  (*Id.* ¶ 107).

Before addressing Defendant's arguments on these claims, the Court addresses the threshold issue of whether Plaintiff properly exhausted her administrative remedies with respect to her ADA claims before bringing the instant suit.  "Exhaustion of administrative remedies and the timely filing of a complaint with the [Equal Employment Opportunity Commission ("EEOC")] are preconditions to filing an ADA action in federal court."  *Cohn* v. *KeySpan Corp.*, 713 F. Supp. 2d 143, 155 (E.D.N.Y. 2010) (citing *Curto* v. *Edmundson*, 392 F.3d 502, 503 (2d Cir. 2004)).  This includes receiving a right-to-sue letter from the EEOC.  *See* 42 U.S.C. §§ 2000e-5, 12117(a); *EEOC* v. *Waffle House, Inc.*, 534 U.S. 279, 291 (2002).  Administrative exhaustion is an essential element of the ADA's statutory scheme, the purpose of which is to avoid unnecessary judicial action by the federal courts by "[giving] the administrative agency the opportunity to investigate, mediate, and take remedial action."  *Johnson* v. *Xylem Inc.*, 613 F. Supp. 3d 677, 680, No. 19 Civ. 130 (EAW) (W.D.N.Y. Apr. 16, 2020) (citing *Stewart* v. *U.S. Immigr. & Naturalization Serv.*, 762 F.2d 193, 198 (2d Cir. 1985)).

During the pre-motion conference before this Court on December 21, 2022, Plaintiff stated that she received a right-to-sue letter from the EEOC on December 7, 2022.  (Dkt. #34 ("Dec. 21, 2022 Tr.") at 27:11-17).  Despite the Court's directive to include this fact in her amended complaint, Plaintiff failed

to do so.  (*See generally* TAC).  The Court notes, however, that Defendant received a record from the EEOC that Plaintiff had been issued a right-to-sue letter (*see* Dec. 21, 2022 Tr. 27:21-28:13), and nowhere did Defendant cite administrative exhaustion as a reason to dismiss Plaintiff's claims in its Motion to Dismiss or Reply (*see generally* Def. Br.; Def. Reply).  Because the exhaustion requirement is not a jurisdictional requirement and is therefore waivable, *see Francis* v. *City of New York*, 235 F.3d 763, 768-69 (2d Cir. 2000) (stating that administrative exhaustion in the ADA context "is not a jurisdictional [prerequisite], but only a precondition to bringing [suit] … that can be waived by the parties or the court"), the Court deems it to have been waived by Defendant and therefore not a basis upon which to dismiss Plaintiff's claims.

Defendant argues that Plaintiff cannot maintain a cause of action for failure to accommodate under either statute because she fails to plausibly allege that she is a qualified individual within the meaning of the statutes. (Def. Br. 11).  The Court agrees.  Discrimination claims under the ADA and Rehabilitation Act are analyzed using the *McDonnell Douglas* burden-shifting scheme.  *See McBride* v. *BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (ADA); *Horwitz* v. *L. & J.G. Stickley, Inc.*, 20 F. App'x 76, 79 n.1 (2d Cir. 2001) (summary order) (holding that requirements of ADA and Rehabilitation Act are "nearly identical"); *see generally McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-05 (1973).  A plaintiff states a *prima facie* failure to accommodate claim by alleging that: "[i] [she] is a person with a disability

under the meaning of the [Act]; [ii] an employer covered by the statute had notice of [her] disability; [iii] with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and [iv] the employer has refused to make such accommodations." *Rodal* v. *Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004). Plaintiff fails to satisfy the first element, that she is a person with a disability within the meaning of the statutes, and as such cannot make out a *prima facie* case.

The ADA defines an "individual with a disability" as a person (i) with "a physical or mental impairment that substantially limits one or more major life activities of such individual" and (ii) that has "a record of such impairment" or is "regarded as having such an impairment." 42 U.S.C. § 1202(1); 29 U.S.C. § 705(20)(B) (incorporating the ADA's definition of "individual with a disability" in the Rehabilitation Act). A "physical or mental impairment" is defined as "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2).

Here, Plaintiff states that she has been diagnosed with shortness of breath and chronic fatigue and has been prescribed medication for depression and anxiety. Even assuming *arguendo* that one or more of Plaintiff's diagnosed conditions may be classified as a "physical or mental impairment" under the ADA and Rehabilitation Act, the claim that such diagnoses "substantially impaired" a major life activity has not been adequately pleaded.

15

As relevant here, in evaluating a claimed impartment to the major life activity of working, "[t]he term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Muller* v. *Costello*, 187 F.3d 298, 312 (2d Cir. 1999) (quoting 29 C.F.R. § 1630.2(j)(3)(i)).  If the plaintiff establishes only "the inability to perform a single, particular job," she has failed to establish a substantial impairment to her major life activity of working.  *Id.*; *see also Woolf* v. *Strada*, 949 F.3d 89, 94 (2d Cir. 2020) (holding that it is "well-settled … that the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working"); *Nurriddin* v. *Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (same, involving a claim under Section 504 of the Rehabilitation Act of 1973).

Plaintiff alleges that she was "not mentally equipped" to return to a "hostile work environment," but that she could otherwise perform her duties remotely.  (TAC ¶ 107).  Importantly, nowhere does Plaintiff allege that her mental and physical health prevented her from performing a "broad range of jobs," simply that "repeated threats of disciplinary action, suspension, and termination failed to get [her] to return to in-person work."  (Pl. Opp. 42).  Since the position of project manager at the DOE constitutes a single, particular job, and since a limitation on a single job cannot constitute a substantial limitation of the major life activity of working, Plaintiff is not "disabled" within the meaning of the ADA or the Rehabilitation Act.  *See Woolf*, 949 F.3d at 94

16

(finding that because the plaintiff did not attempt to show that his work-induced impairment "substantially limited his ability to work in a class or broad range of jobs," "no reasonable factfinder could conclude that [plaintiff] ha[d] a 'disability' within the meaning of the ADA").  Accordingly, Plaintiff's failure to accommodate claims under these two statutes are dismissed.

### 2.    The Court Grants Defendant's Motion to Dismiss Plaintiff's USERRA Claim

Defendant interprets Plaintiff's TAC as "possibly asserting" a discrimination claim under USERRA.  (Def. Br. 15).  Presumably, Defendant's belief arises from Plaintiff's repeated references to a provision of that statute, 38 U.S.C. § 4323, in the TAC.  (*See* TAC ¶¶ 1-3, 5-6).  By way of background, USERRA prohibits discrimination in employment on the basis of military service, and provides, in relevant part, that:

> [a] person who is a member of, ... has performed, ... or has an obligation to perform service in a uniformed service shall not be denied ... retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, ... performance of service, ... or obligation[.]

38 U.S.C. § 4311(a).

An employer engages in a prohibited act under USERRA if membership in the uniformed services is a motivating factor in the employer's denial of any benefit of employment to an employee, unless the employer can prove that the action would have been taken in the absence of such a membership.  *See* 38 U.S.C. § 4311(c)(1).  The term "uniformed services," as defined under the statute, includes "the Armed Forces, the Army National Guard and the Air

National Guard ... and any other category of persons designated by the

President in time of war or national emergency."  38 U.S.C. § 4303(17).  Here,

Plaintiff fails to state a cause of action under USERRA because she fails to

allege that she is a member of the "uniformed services" as defined under the

statute.  Accordingly, Plaintiff's USERRA claim is also dismissed.

### 3. Plaintiff Plausibly Alleges Retaliation Under the ADA and the Rehabilitation Act

Separately, Plaintiff alleges throughout the TAC that the DOE repeatedly

retaliated against her following the mold exposure incident in 2019.  Among

other allegations, Plaintiff claims that the DOE repeatedly "took adverse

employment action[s]" against her, including repeatedly cutting her pay,

denying her medical leave submissions, removing her remote user access,

subjecting her to disciplinary hearings, and, ultimately, terminating her

employment.  (*See, e.g.*, TAC ¶¶ 29, 38).  Plaintiff further alleges that these

adverse actions often occurred shortly after she filed or logged complaints

regarding her work-related injury, and were designed to "smear and humiliate

[her]," to prevent her from "producing any evidence of workplace violations,"

and "to pressure [her] to resign."  (*Id.* ¶¶ 89, 90).  Reading Plaintiff's *pro se*

submissions to "raise the strongest arguments they suggest," *McLeod* v. *Jewish*

*Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (per curiam) (internal

quotation marks omitted), the Court construes Plaintiff as pleading claims for

retaliation under the ADA and the Rehabilitation Act.[3]

---

[3]     Based on the record, Plaintiff may also have plausible claims for retaliation under
        Section 15(a)(3) of the Fair Labor Standards Act (the "FLSA") and under Section 120 of

The ADA makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]."  42 U.S.C. § 12203(a).  The Rehabilitation Act contains similar provisions against retaliation, governed in this respect by the same standards as the ADA.  *See* 29 U.S.C. § 794(d); *Weixel* v. *Bd. of Educ. of the City of New York*, 287 F.3d 138, 148-49 (2d Cir. 2002).

To state a claim of retaliation under the ADA, a plaintiff must show: "(i) [she] was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action."  *Natofsky* v. *City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (internal quotation marks and citation omitted).

---

the New York Worker's Compensation Law.  While the Court will construe Plaintiff's submission to "raise the strongest arguments" it suggests, the Court will not evaluate claims that are procedurally barred or otherwise unresolvable by the Court.  *McLeod* v. *Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (per curiam).  Taking Plaintiff's potential claims in turn, any possible claim for retaliation for requesting medical leave is time-barred under the FLSA, as the statute of limitations to bring a retaliation action has long passed, *see Parada* v. *Banco Indus. De Venez., C.A.,* 753 F.3d 62, 70 (2d Cir. 2014) (quoting 29 U.S.C. § 255(a)) (stating that the FLSA provides a two-year statute of limitations on actions to enforce its provisions), and, to the extent that the TAC contains allegations of retaliation because Plaintiff sought workers' compensation, this Court lacks jurisdiction to hear these claims, *see Ridgway* v. *Metro. Museum of Art*, No. 06 Civ. 5055 (SAS), 2007 WL 1098737, at *5 (S.D.N.Y. Apr. 10, 2007) (stating that the New York Worker's Compensation Law provided an "exclusive remed[y]" to employees on these matters).

As an initial matter, Plaintiff plausibly alleges the first three elements of a *prima facie* case.  *First*, it is well-established that requesting a reasonable accommodation of a disability is a "protected activity" under the ADA. *See Weixel*, 287 F.3d at 149.  This is true even if a plaintiff's claim that she was entitled to a reasonable accommodation was mistaken, so long as it was made in good faith.  *See Conley* v. *United Parcel Service,* 88 F. Supp. 2d 16, 20 (E.D.N.Y. 2000).  Here, Plaintiff's requests to work remotely constitute protected activity.  While Plaintiff's belief in her entitlement to such accommodation may have been mistaken, there is no evidence to suggest that Plaintiff did not subjectively believe the DOE's actions were discriminatory. *Second*, Defendant had knowledge of Plaintiff's requests as Plaintiff submitted her request to her supervisor and to the ODA.  (TAC ¶¶ 105, 107).  *Third*, Plaintiff adequately pleads an adverse employment action occurred.  An adverse employment action in the retaliation context is "any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  *Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (citation omitted); *see also Hicks* v. *Baines*, 593 F.3d 159, 169 (2d Cir. 2010).  Here, Plaintiff's allegations that the DOE launched a series of payroll deductions of $289.15 from Plaintiff's paycheck every pay period following her requests to work remotely is sufficient to constitute an adverse employment action.  *See Vega*, 801 F.3d at 91 (finding "temporary paycheck reduction" to constitute an adverse employment action).

Plaintiff's *prima facie* case is weakest as to the fourth element, a causal connection between the protected activity and some adverse employment action. *See Vega*, 801 F.3d at 90. A causal connection may be shown either "[i] indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees [or union members] who engaged in similar conduct; or [ii] directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Id.* (internal quotation marks and citation omitted). Here, the Court finds that Plaintiff has pleaded a sufficiently close temporal relationship between her requests for an accommodation on April 22, 2021, and May 5, 2021, and the DOE's alleged docking of her payments beginning May 28, 2021, to plead a causal connection. *See Cifra* v. *General Electric Co.*, 252 F.3d 205, 217 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (internal quotation marks omitted)); *see also Salas* v. *N.Y.C. Dep't of Inv.*, 298 F. Supp. 3d 676, 687 (S.D.N.Y. 2018) (finding that a two-month period "nudge[s]" plaintiff's causation allegations "across the line from conceivable to plausible").

Accordingly, while Defendant may well be able to articulate a legitimate, non-retaliatory reason for the employment actions taken against Plaintiff — and, indeed, this Court is skeptical that Plaintiff's claim will survive a summary judgment motion — at this stage of pleading, Plaintiff has plausibly alleged

enough facts to support a retaliation claim under the ADA and the Rehabilitation Act. These claims can proceed to discovery.

## CONCLUSION

For the foregoing reasons, Defendant's motion is GRANTED with prejudice as to Plaintiff's failure to accommodate claim under the ADA and the Rehabilitation Act and as to any claim Plaintiff intended to raise under USSERA. Defendant's motion is DENIED as to Plaintiff's retaliation claim under the ADA and Rehabilitation Act.

The Clerk of Court is ordered to terminate the pending motion at docket number 52. The parties are directed to meet and confer, and to submit a proposed case management plan on or before **December 29, 2023.**

SO ORDERED.

Dated:      December 5, 2023
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

22